## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                             No. CR 06-2575 LH

MANUEL GOMEZ-VALENZUELA,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 7, 2007, Defendant filed a Motion to Suppress Evidence and Statements (Doc. 20).  Defendant seeks to suppress any statements and physical evidence seized as a result of Defendant's alleged illegal detention and arrest on August 25, 2006.  Defendant also requests the Court to exclude evidence of identifying information (fingerprints), statements made by Defendant, the agents' identification of Defendant, Defendant's "A file", and other evidence that is the fruit of the August 25, 2006 search and seizure.  The Court held a hearing on this motion on April 30, 2007.  At the close of the hearing, the Court granted Defendant's request for additional briefing.  Defendant filed a Supplemental Memorandum in Support of Suppression on May 22, 2007, and the United States filed its supplemental response on June 14, 2007.  The Court, having considered the parties' memoranda, the supplemental briefs, the arguments of counsel, the relevant case law, and the evidence presented at the suppression hearing, finds that the motion is not well taken and will deny the motion.

## I.    FACTUAL FINDINGS

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a pretrial motion that involves factual issues.  The

Court has closely analyzed and compared the testimony of all the witnesses.[1]  The Court finds that

the testimony of San Juan County Sheriff's Deputy Scott Facka and Immigration and Customs

Enforcement Agents Sonny Garcia and Roland O'Briant was credible, that Defendant gave a

different and contradictory version of his encounter with Agent O'Briant, and that Agent

O'Briant's testimony was more credible and consistent with the evidence presented.  The Court

therefore makes the following additional findings of fact.

On the night of August 25, 2006, members of the San Juan County Sheriff's Office gang

unit teamed up with agents of Immigration and Customs Enforcement ("ICE") to conduct a joint

anti-gang operation in Kirtland, New Mexico.  The purpose of the operation was to contact

and/or try to serve arrest warrants on known or suspected gang members who were also possibly

illegal aliens.  Deputy Scott Facka, a detective with the San Juan County Sheriff's Office,

participated in the operation, as did ICE Agents Sonny Garcia and Roland O'Briant.

The night of the anti-gang operation, Deputy Facka and approximately eight to ten other

law enforcement officers approached a house in the Kirtland, New Mexico area after dark.

Detective Facka had been to this house before in conjunction with his duties as a sheriff's deputy.

Deputy Facka knew that gang members who were illegal aliens had previously lived in the house.

The law enforcement officers involved in the operation did not have an arrest warrant for anyone

residing in the house.  Nevertheless, they went to the house because they intended to conduct a

"knock and talk."  Deputy Facka knew that Pedro Arizmendi lived there and they wanted to

---

[1]Defendant states in his supplemental brief that it was "apparent" that the Court had "some
difficulty understanding him" due to his "relatively thick accent."  The Court notes that it had
difficulty understanding Defendant initially due to his accent and his not speaking into the
microphone.  Once Defendant spoke into the microphone, however, the Court could understand
Defendant without the need for an interpreter.

contact him and other residents to see who else was living there and to try to talk to them about gang membership and affiliation. Pedro Arizmendi was a person of interest because he was a known illegal alien, he was affiliated with a suspected gang house, and his brother was a known gang member of the 18th Street gang.

The red-brick house in Kirtland had an attached garage. There was a short chain-link fence enclosing the grass yard. An unenclosed driveway ("Driveway 1") led to the garage and to the walkway to the front door of the main house. The only path to approach the front door of the house was to walk along Driveway 1. Attached to the house was a separate apartment behind the garage. A second, longer driveway ("Driveway 2") followed east-west along the southern side of the house, directly adjacent to the first driveway and separated by a couple bushes and a tree. Driveway 2 led to the door of the apartment, which faced to the south. There was no fence or gate blocking access to Driveway 2.

The officers and agents drove to the house in three vehicles and parked on the north side of the property along the chain-link fence. Each of the law enforcement officers had his service weapon. At least two of the law enforcement officers carried AR-15 assault rifles. Agent Garcia was wearing a tactical vest with "police" on its front and back and had an AR-15 slung over his shoulder. They walked south along the fence. Deputy Facka then turned up Driveway 1. Deputy Facka was near the front of the team of law enforcement officers. Agent O'Briant was also near the front of the other officers and carried a service weapon. Agent Garcia was behind approximately three or four of the other officers as they approached the house. As Deputy Facka entered Driveway 1 and got closer to the house, he observed an individual in Driveway 2 walking away from him.

Deputy Facka then began walking toward the individual on Driveway 2.  Agent Garcia saw Deputy Facka turn the corner of the house onto Driveway 2 but did not see the individual. Deputy Facka asked the individual to stop, identified himself as with the gang unit of the San Juan County Sheriff's Office, and asked the individual if he could talk to him.  The individual, who Deputy Facka knew as Tex, stopped to talk to Deputy Facka.  At that point they were on Driveway 2, approximately where the white car is located in Plaintiff's Exhibit 1.  While Deputy Facka spoke with Tex, he noticed a strong odor of burnt marijuana emanating from the area. Deputy Facka was familiar with the smell of marijuana, as he had smelled it numerous times during the course of his law enforcement duties.

Shortly after making contact with Tex, another individual, Pedro Arizmendi walked out of the apartment door.  Deputy Facka began speaking to Mr. Arizmendi.  Deputy Facka observed that Mr. Arizmendi smelled of marijuana, at which point Deputy Facka believed that the marijuana odor was emanating from the open door to the apartment.  Deputy Facka asked Mr. Arizmendi if he had been smoking marijuana.  Mr. Arizmendi responded that he had and further volunteered that the marijuana was inside the apartment.  Deputy Facka asked Mr. Arizmendi if he could go into the apartment to retrieve it.  Mr. Arizmendi said, "yes," and told him exactly where the marijuana was located.[2]  Deputy Facka never drew his service revolver throughout this entire incident.

As Deputy Facka conversed with Tex and Pedro Arizmendi, other individuals came out of the apartment.  Other law enforcement officers began approaching these individuals to speak with

---

[2]At some point thereafter, when the apartment was empty, Deputy Facka entered the apartment with Pedro Arizmendi.  Deputy Facka found 4 grams of marijuana in the apartment as well as a glass methamphetamine pipe.

them and to ascertain their identities.  At this point, none of the law enforcement officers had

ordered anyone to exit the apartment.  When Agent O'Briant arrived at the side of the house, he

observed a number of people in Driveway 2 and smelled an odor of marijuana.  Agent O'Briant

saw Defendant leaning against a vehicle that was parked outside the apartment.[3]  Defendant was

already outside the apartment when Agent O'Brient arrived.  Agent O'Briant never entered the

apartment or pulled anyone outside the apartment.  Agent O'Briant approached Defendant and

asked him for his identification.  Defendant said that he was a citizen of Mexico.  Agent O'Briant

never pointed his weapon at Defendant or touched him during this initial encounter.[4]

At around this time, Agent Garcia walked past Deputy Facka.  Agent Garcia noticed that

Agent O'Briant was speaking with Defendant.  As Agent Garcia approached Agent O'Briant, he

also noticed the smell of burnt marijuana.  As he approached, Agent Garcia's weapon was pointed

to the ground and not at Defendant.  Agent Garcia walked to the side of Agent O'Briant.

Agent O'Briant requested immigration documents from Defendant.  Defendant did not

answer.  Agent O'Briant then repeated, "I.D."  Defendant opened his wallet, which contained

numerous identification cards.  Agent O'Briant saw a resident alien card and said, "Let me have

---

[3]Defendant resided in the apartment with Pedro Arizmendi.

[4]According to Defendant's testimony, the same officer that grabbed him out of the house
also interrogated him.  Defendant repeatedly testified that he believed Agent O'Briant was this
officer.  According to both Agent Garcia and Agent O'Briant, Agent O'Briant was the agent who
questioned Defendant about his identity.  Agent O'Briant also testified that he did not pull
Defendant out of the house by the arm and that he first encountered Defendant when Defendant
was already outside.  The Court thus finds that Defendant's and Agent O'Briant's testimony were
directly contradictory.  The Court also notes that Defendant was present in court when Agent
O'Briant testified.  After the conclusion of Agent O'Briant's testimony, Defendant did not ask to
retake the stand to clarify that Agent O'Briant was not the officer who pulled him out of the
apartment and questioned him.

5

that i.d."  Defendant then handed him a resident alien card with the name Manuel Gomez-Valenzuela.  During this conversation, Defendant was not in handcuffs and Agent O'Briant did not have his hand on Defendant.  Only Agent Garcia and Agent O'Briant were standing right next to Defendant at the time.

Agent O'Brient handed the card to Agent Garcia.  Because resident alien cards are sometimes forgeries or stolen, Agent Garcia stepped to the side and called the Law Enforcement Support Center ("LESC") on his cellular phone to run the resident alien card number in order to verify that the number belonged to the named individual.  The LESC advised that the individual with this alien number had been previously deported as an aggravated felon.  This call lasted approximately three to five minutes.  At some point shortly after the completion of the call, Defendant was placed in handcuffs and arrested.

## II.    DISCUSSION

Defendant raises various arguments in support of his motion to suppress.  First, Defendant argues that he was unlawfully seized and arrested in his apartment.  Additionally, even if the Court found that the agents detained Defendant outside his apartment, Defendant contends that the seizure was unlawful because they illegally entered his curtilage, the agents lacked a reasonable suspicion that Defendant was engaged in criminal activity, and his detention amounted to a *de facto* arrest.  Defendant argues that, because of the Fourth Amendment violation, all statements and evidence of his identity must be suppressed as fruit of the poisonous tree.  Finally, Defendant seeks to suppress any statements he made to the agents based on an alleged violation of his *Miranda* rights.

### A.    Fourth Amendment

6

1.      **Entry of Curtilage**

A warrantless search is unconstitutional if the defendant has a legitimate expectation of privacy in the area to be searched.  *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998).  To establish a legitimate expectation of privacy, the defendant must show (1) a subjective expectation of privacy in the area to be searched, and (2) society is prepared to recognize that expectation as reasonable.  *Id.*  A defendant has a legitimate expectation of privacy in both the home and the curtilage of the home.  *Oliver v. United States*, 466 U.S. 170, 180 (1984).  The defendant has the burden to present evidence that the search was conducted within the curtilage.  *See United States v. Cavely*, 318 F.3d 987, 993-94 (10th Cir. 2003).

The curtilage is defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'"  *Oliver*, 466 U.S. at 180 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).  To determine whether an area is part of the curtilage, a court looks at four factors: (1) the proximity of the area claimed to be the curtilage of the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by passers-by.  *See United States v. Dunn*, 480 U.S. 294, 301 (1987).

In this case, Agent O'Briant first encountered Defendant outside the apartment on Driveway 2.  Although Driveway 2 is in close proximity to the apartment, the driveway is not included within the short chainlink fence surrounding the home.  Moreover, there is no evidence that the area was being used for the intimate activities of the home.   Rather, the area appeared to be used merely as a driveway.  Finally, the evidence does not show that the residents did anything to protect the driveway from passers-by.  There was no fence or gate blocking the driveway to

7

prevent a person from wandering onto the property and seeing what lay within.  Instead, the

unobstructed driveway was the expected path a person would take to access the apartment.

Defendant therefore had no reasonable expectation of privacy in Driveway 2 and the driveway

does not constitute the curtilage of the house and/or apartment.  *See United States v. Echeverria*,

203 Fed. Appx. 936 (10th Cir. 2006) (unpublished opinion) (unobstructed driveway beside house

does not constitute curtilage); *United States v. Cousins*, 455 F.3d 1116, 1122 (10th Cir. 2006)

(side yard area immediately adjacent to house was not within curtilage of home because area was

enclosed on only three sides, unenclosed side was expected path one would take to get to side

yard, unenclosed side was paved sidewalk, and no steps were taken to limit access to walkway).

As the Tenth Circuit explained:  "[W]hen the police come on to private property to

conduct an investigation . . . and restrict their movements to places visitors could be expected to

go (e.g., walkways, driveways, porches), observations made from such vantage points are not

covered by the Fourth Amendment."  *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir.

2003) (quoting 1 Wayne R. LaFave, *Search & Seizure:  A Treatise on the Fourth Amendment*

§ 2.3(f), at 506-08 (3d ed. 1996)).  Consequently, the law enforcement officers and agents were

lawfully on Driveway 2 and their observations from the driveway, including smelling marijuana,

did not constitute an unlawful search.  *See id.* (no reasonable expectation of privacy in driveway

open to public, therefore, police observations from driveway did not constitute search).

### 2.       Investigative Detention

"A seizure occurs only when an officer, by means of physical force or show of authority,

in some way restrains the liberty of a citizen."  *United States v. Spence*, 397 F.3d 1280, 1283

(10th Cir. 2005).  An investigative detention, a brief seizure based on reasonable suspicion of

criminal activity, occurs when the defendant has an objective reason to believe he is not free to end the conversation and proceed on his way. *See United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). An investigative detention is an exception to the probable cause requirement. *See Terry v. Ohio*, 392 U.S. 1, 26 (1968). An investigative detention is justified at its inception only if the officer is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the detained individual may be engaged in criminal activity. *See id.* at 20-21.

This Court has already found that Defendant was outside the apartment when first approached by law enforcement agents and that no law enforcement agent instructed him to leave the apartment. Moreover, the Court found that, upon turning the corner to Driveway 2, Deputy Facka, Agent Garcia, and Agent O'Briant each smelled the odor of marijuana emanating from the area. At that point, they had a reasonable suspicion of criminal activity to justify an investigative detention of Defendant, who was outside the apartment in the vicinity of the odor. *See United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (officer had reasonable suspicion to justify further detention and questioning when he smelled odor of marijuana emanating from inside vehicle); *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991) (noting that Tenth Circuit has long recognized that marijuana has distinct smell and its odor alone can satisfy probable cause requirement to search vehicle or baggage).

Defendant contends, however, that he was subject to a *de facto* arrest requiring probable cause. Defendant argues that the presence of eight to ten armed officers in a narrow driveway at 10:30 at night, some of whom were shouting and ordering individuals to step aside, transformed the encounter with Defendant into an unlawful arrest. The Court disagrees.

9

Once police make an investigative detention, the scope and duration of the detention must be reasonably related in scope to the circumstances that justified the detention in the first place. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (quoting *Terry*, 392 U.S. at 20). If police actions exceed what is reasonably necessary to protect their personal safety under the totality of the circumstances, the stop may only be justified by probable cause or consent. *Id.* There is no bright-line rule for determining when a detention turns into a *de facto* arrest. *See id.* at 1052. The evaluation instead must be guided by common sense and ordinary human experience. *Id.* Under the Fourth Amendment, the intrusiveness of the seizure will be upheld if it was reasonable under the totality of the circumstances. *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). Reasonableness is determined by weighing the character of the official intrusion on the person's liberty and its justification. *See Michigan v. Summers*, 452 U.S. 692, 700-01 (1981).

Although there were eight to ten armed officers outside the house and apartment, they were approaching a house known for its affiliation with gang activity. Moreover, only Agent O'Briant and Agent Garcia approached Defendant to question him about his identity. Neither Agent O'Briant nor Agent Garcia pointed their weapons at Defendant during the encounter. Defendant was also not placed in handcuffs during the questioning. The agents did not handcuff Defendant until after they had determined that he was previously deported as an aggravated felon. During their attempts to identify Defendant, the agents did not grab, hold, or physically restrain him in any way. The questioning was done outside in the driveway in the presence of a number of other citizens. The record does not show that Agent O'Briant's tone during the questioning was threatening or coercive. Finally, the conversation with Defendant was relatively brief, consisting

10

of Agent O'Briant asking for Defendant's identification, Defendant handing over his resident alien card, and Agent Garcia placing a three to five minute phone call to the LESC.  Weighing the character of the official intrusion with the agents' need to investigate the criminal activity observed, the Court concludes that the detention of Defendant did not rise to the level of a *de facto* arrest.

### 3.      Probable Cause to Arrest

Defendant was not handcuffed and placed under arrest until after Agent Garcia learned that Defendant was previously deported as an aggravated felon.  At that point, the agents had probable cause to arrest Defendant.

### B.      *Miranda*

*Miranda* warnings are only required when a suspect is in custody and subjected to interrogation.  *Illinois v. Perkins*, 496 U.S. 292, 295 (1990).  A person is in custody if there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.  *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000).  The test is whether a reasonable man in the suspect's position would have understood his situation as the functional equivalent of formal arrest.  *Id.* (quoting *Berkemer v. McCarty*, 468 US 420, 442 (1984)).  This is an objective test.  *Id.*  The agent's unarticulated "subjective intention" is irrelevant.  *United States v. Wynne*, 993 F.2d 760, 764 (10th Cir. 1993).  Additionally, the fact that the suspect may be the "focus" of the investigation does not mean that he is in custody.  *United States v. Chalan*, 812 F.2d 1302, 1306 (quoting *Beckwith v. United States*, 425 U.S. 341, 347(1976)).

Defendant was not placed under formal arrest, and thus not in custody, until after the agents learned that he had been previously deported as an aggravated felon and handcuffed him.

Therefore, any statements made by Defendant during the investigative detention in the driveway were not elicited in violation of Defendant's Fifth Amendment rights.

## III.     CONCLUSION

In summary, Driveway 2 was not within the curtilage of the home or apartment, and thus, the agents were lawfully on the driveway when they noticed the odor of marijuana emanating from the apartment.  When they recognized the smell of marijuana, the agents had reasonable suspicion of criminal activity to justify an investigative detention of Defendant, who was already outside the apartment when first encountered by the agents.  Based on the totality of the circumstances, the scope of the investigative detention did not transform the encounter into a *de facto* arrest.  Defendant was not placed under arrest until after the agents learned that he had been previously deported as an aggravated felon and handcuffed him.  At the point when he was arrested outside the apartment, the agents had probable cause to do so.  Therefore, the agents did not violate Defendant's Fourth Amendment rights.  Finally, because Defendant was not placed in custody until after the agents learned he had been deported as an aggravated felon, any statements he made during the investigative detention in the driveway were not elicited in violation of Defendant's Fifth Amendment rights.  There are therefore no grounds to support suppression of the evidence and statements in this case.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 20) is **DENIED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE